## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**TONY MASSENBURG**
8210 Crestwood Heights Drive, #731
McLean, VA 22102

**LANIE NIKES**
8210 Crestwood Heights Drive, #731
McLean, VA 22102

        Plaintiffs,

        v.

**DORANNA TINDLE**
10512 Mullikin Drive
Clinton, MD 20735

        Defendant.

Civil No. _____

## COMPLAINT

For their Complaint against Defendant **Doranna Tindle**, Plaintiffs **Tony Massenburg** and **Lanie Nikes**, by their undersigned attorney, upon knowledge as to their own actions and dealings, and upon information and belief as to Ms. Tindle's actions, allege as follows:

## NATURE OF THE ACTION

1.     This matter concerns the malicious, destructive actions of Ms. Tindle against Mr. Massenburg, with whom she was in a relationship years ago and with whom she has a son, and against Ms. Nikes, Mr. Massenburg's domestic partner of several years and fiancée.

2.     Ms. Tindle has engaged in a disturbing pattern of making false and defamatory statements about Mr. Massenburg to his employer, to the media, online, to his benefits manager, to his health insurer, and even to the FBI to try to disrupt Mr. Massenburg's life, injure his

reputation, cause financial losses, ruin his and Ms. Nikes's careers, and inflict emotional distress on him and Ms. Nikes.

3.     Ms. Tindle's premeditated campaign of attacks against Mr. Massenburg was designed to destroy everything Mr. Massenburg has and holds dear.

4.     While falsely accusing Mr. Massenburg and Ms. Nikes of fraud, Ms. Tindle perpetrated her own elaborate fraud in which she impersonated Mr. Massenburg and stole his identity so as to obligate him to their son's private school for around $30,000 a year in tuition, without his knowledge and consent.

5.     Mr. Massenburg became aware of Ms. Tindle's scheme only when the school sought to garnish his wages after securing a judgment in a legal action against Mr. Massenburg of which Ms. Tindle made sure Mr. Massenburg was unaware.

6.     On another occasion, when Mr. Massenburg refused to falsely claim Ms. Tindle on his health insurance as his domestic partner when Ms. Nikes was his domestic partner and already covered by his insurance, Ms. Tindle made false accusations against Mr. Massenburg and Ms. Nikes of insurance fraud to his benefits manager, his insurer, and law enforcement.

7.     Mr. Massenburg and Ms. Nikes have initiated this action to hold Ms. Tindle to account for the serious harm she has done to Mr. Massenburg and Ms. Nikes's reputation and well-being and for the financial losses and expenses they have incurred in dealing with Ms. Tindle's egregious, tortious conduct.

## **PARTIES**

8.     Plaintiff Tony Massenburg is a Viriginia citizen, residing at 8210 Crestwood Heights Drive, #731, in McLean Virginia.

9.     Mr. Massenburg is a former NBA professional basketball player. Mr. Massenburg

is currently a television broadcaster for the Washington Wizards as well as a public speaker, author, and radio personality.

10.     Plaintiff Lanie Nikes is a Viriginia citizen, residing at 8210 Crestwood Heights Drive, #731, in McLean Virginia.

11.     Ms. Nikes is a Certified Financial Planner, a FINRA licensed Registered Representative and Investment Advisor Representative, and a Life and Health Insurance Agent.

12.     Mr. Massenburg and Ms. Nikes are domestic partners. They are engaged to be married.

13.     Defendant Doranna Tindle is a Maryland citizen, residing at 10512 Mullikin Drive, in Clinton, Maryland.

14.     Ms. Tindle is a Licensed Master Social Worker and a PhD student in clinical social work.

15.     Ms. Tindle and Mr. Massenburg were never married but were previously in a relationship that produced a minor son ("Son") in 2017, over whom they share joint custody.

16.     On December 1, 2023, Ms. Tindle pled guilty in Charles County, Maryland to violating Maryland criminal law by driving without a license and on a revoked license for approximately 12 years and producing false identification when stopped by police. This was her third offense for driving on a revoked or suspended license. She previously pled guilty to this offense on December 3, 2010 and July 25, 2014.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over Ms. Tindle pursuant to Md. Code, Cts. & Jud. Proc. § 6-102 because she is domiciled in Maryland.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Tindle resides in this judicial district.

### STATEMENT OF FACTS

Aidan Montessori School Fraud

20.     On or about January 28, 2020, Ms. Tindle completed a 2020-2021 Enrollment Agreement for Mr. Massenburg and Ms. Tindle's Son with the Aidan Montessori School ("School"), a private school located in Washington, D.C. that, at the time, charged around $30,000 per year for primary school tuition.

21.     At the time that she completed the Enrollment Agreement, Ms. Tindle created an email account with the email address, tony.massenburg4434@gmail.com.

22.     Ms.     Tindle     admits     that     she     created     the     email     address, tony.massenburg4434@gmail.com.

23.     Ms. Tindle created this email address without Mr. Massenburg's knowledge or consent.

24.     Ms. Tindle created this email address with the intention of defrauding the School and Mr. Massenburg by falsely representing that the email address belonged to Mr. Massenburg when, in reality, it belonged to her and only she had access to it.

25.     After creating this email address, Ms. Tindle used this email address to sign multiple documents with the School to obligate Mr. Massenburg for tuition and other expenses to which he had never agreed and of which he was not even aware at the time.

26.     In a letter on April 2, 2024 from Ms. Tindle's counsel to Mr. Massenburg's parents,

Ms. Tindle's counsel falsely claimed that Mr. Massenburg knew about the tony.massenburg4434@gmail.com email address, and used it when she was working with Mr. Massenburg's publicist.

27.     In fact, Mr. Massenburg does not have a publicist and he knew nothing of the creation of this email address by Ms. Tindle, which was done without his consent and to perpetrate a fraud against the School and Mr. Massenburg.

28.     On the School application, Ms. Tindle also falsely listed Mr. Massenburg's residence as the same as Ms. Tindle's, even though Mr. Massenburg lived in Virginia while Ms. Tindle lived in Maryland. In fact, Mr. Massenburg had moved out of Ms. Tindle's residence in October 2018, years before she completed the School's application. She also falsely identified her telephone number as Mr. Massenburg's number, and falsely provided her mother's email address in place of Mr. Massenburg's actual email address, to ensure that Mr. Massenburg remained unaware of her fraudulent efforts to make him financially responsible for the tuition without his knowledge or consent.

29.     At the time, Mr. Massenburg was completely unaware that Ms. Tindle had signed his name to the Enrollment Agreement in an attempt to make him financially responsible for the School's tuition. By signing Mr. Massenburg's name without his knowledge and consent, Ms. Tindle also purported to have Mr. Massenburg agree to other obligations to the School.

30.     On or about May 4, 2020, Ms. Tindle completed a TADS Agreement to assist with the payment of the School's tuition. TADS stands for "Tuition Aid Data Services."

31.     In completing the TADS agreement, Ms. Tindle signed Mr. Massenburg's name without his knowledge or consent, and utilized the email address she had created, tony.massenburg4434@gmail.com, to ensure that all communications about the TADS Agreement

went to her, and not Mr. Massenburg.

32.     On April 28, 2021, Mr. Massenburg and Ms. Tindle entered into a Parenting Plan for their Son.

33.     The Parenting Plan includes an Education provision. It states: "Mother has unilaterally enrolled the minor Child in Aiden [sic] Montessori School in Palisades. Father does not consent to private school generally, but does not object to the minor Child's current enrollment, selected by Mother. **Given Father's objection to private schooling, Father does not agree and is not required to contribute to tuition.**" (Emphasis added.)

34.     At the time that Mr. Massenburg entered into the Parenting Plan, he was unaware that Ms. Tindle, when she enrolled their Son at the School, had fraudulently obligated Mr. Massenburg to be financially responsible for tuition and related expenses.

35.     In completing the application for the School, Ms. Tindle made numerous false statements and fraudulent misrepresentations on the application, with deceitful and malicious intent to harm Mr. Massenburg.

36.     These false statements and fraudulent misrepresentations by Ms. Tindle included:

a.     Forging Mr. Massenburg's signature on three separate occasions on two different documents, making him responsible for payment and obligating him to various legal terms without his knowledge and consent and despite Ms. Tindle's agreement in the Parenting Plan that she would be solely responsible for paying their Son's tuition;

b.     Falsely stating and fraudulently misrepresenting that Ms. Tindle and Mr. Massenburg were married and/or living in the same home;

c.     Falsely stating and fraudulently misrepresenting that Mr.

6

Massenburg was agreeing to assume financial responsibility for payment of tuition, fees, and expenses to the School when Ms. Tindle knew that Mr. Massenburg had not agreed to do so and, in the Parenting Plan, Ms. Tindle had agreed that she would be solely responsible financially to the School; and

        d.      Providing a false email address for Mr. Massenburg that was created and controlled solely by Ms. Tindle and of which Mr. Massenburg was unaware.

37.     Thereafter, Ms. Tindle failed to pay the School's tuition and other expenses when they were due.

38.     As a result, Ms. Tindle began receiving at her residence correspondence from the School addressed to Mr. Massenburg, indicating that the School was seeking payment from Mr. Massenburg for unpaid tuition and expenses and would file suit against Mr. Massenburg and Ms. Tindle for non-payment.

39.     Mr. Massenburg, who did not live with Ms. Tindle at the time, was unaware of the School's communications and Ms. Tindle never informed Mr. Massenburg of these communications from the School.

40.     On March 22, 2022, the School sued Ms. Tindle and Mr. Massenburg for unpaid tuition in the District Court for Prince George's County, Maryland, case number 05-02-0005923-2022.

41.     Mr. Massenburg was unaware of this lawsuit by the School, in part, because the School sought to serve Mr. Massenburg with process at Ms. Tindle's home, which she fraudulently represented was also Mr. Massenburg's home, and, when the process server arrived, she fraudulently agreed to accept service for Mr. Massenburg even though he did not live there.

42.     Thereafter, Ms. Tindle never informed Mr. Massenburg of the lawsuit or that she

had accepted service of process for him, without authorization.

43.     On July 26, 2022, the School obtained a default judgment against Ms. Tindle and Mr. Massenburg, jointly and severally, in the amount of $1,416.10.

44.     On November 7, 2022, the School filed a Request for Writ of Garnishment—Wages against Mr. Massenburg in the Circuit Court for Prince George's County, Maryland.

45.     On January 11, 2023, the Court issued a Writ of Garnishment—Wages against Mr. Massenburg.

46.     Mr. Massenburg never received notice of the School's lawsuit or default judgment, as the contact information used was the incorrect address and email address that Ms. Tindle had fraudulently included on the application. Upon information and belief, Ms. Tindle received all correspondence related to the School's lawsuit and failed to inform Mr. Massenburg.

47.     Mr. Massenburg did not learn of Ms. Tindle's fraudulent conduct until the School first attempted to garnish his assets.

48.     After Mr. Massenburg, by chance, became aware of Ms. Tindle's fraudulent actions and the ensuing judgment and garnishment, he tried to work with the School to resolve the non-payment issue with Ms. Tindle.

49.     Ultimately, the School was able to satisfy the judgment through collection efforts directed at Ms. Tindle.

50.     However, Mr. Massenburg had to hire an attorney and incur legal fees and expenses in getting this matter resolved. The experience also caused Mr. Massenburg emotional distress in having to deal with Ms. Tindle's fraudulent conduct and the false impression she created about him.

51.     As a result of Ms. Tindle's fraudulent conduct, the judgment against Mr.

Massenburg still remains a matter of public record and has affected Mr. Massenburg's credit history. Moreover, Ms. Tindle's actions created the false impression at Mr. Massenburg's place of employment that Mr. Massenburg was not financially responsible leading to the issuance of a writ of garnishment against him on a debt that he never agreed to assume and of which he was not even aware.

Fraud and Defamation to UnitedHealthcare, Alight, and the FBI

52.     On August 15, 2022, Ms. Tindle submitted a report to Mr. Massenburg's health insurer, UnitedHealthcare, which provides coverage under the NBA Health Plan for retired NBA basketball professionals, as well as to Alight, the plan's administrator.

53.     In her report, Ms. Tindle falsely accused Mr. Massenburg and Ms. Nikes of healthcare fraud.

54.     Ms. Tindle made similar false accusations against Mr. Massenburg and Ms. Nikes to the FBI.

55.     On information and belief, Ms. Tindle made these false accusations of healthcare fraud involving Mr. Massenburg after learning that Ms. Nikes was covered under Mr. Massenburg's health insurance and realizing that Mr. Massenburg and Ms. Nikes were together in a relationship, as they had been previously.

56.     On information and belief, Ms. Tindle made these false accusations in part out of jealousy and anger that Mr. Massenburg was again in a relationship with Ms. Nikes.

57.     In an email on August 15, 2022 to the NBA Players' Health and Welfare Benefit Plan Service Center, Ms. Tindle falsely stated, "Tony Massenberg and Lanie Nikes lied on the affidavit about having a domestic partnership to obtain insurance coverage for her."

58.     Ms. Tindle falsely reported to UnitedHealthcare that, in 2020, Mr. Massenburg

9

added Ms. Nikes to his health insurance even though, according to Ms. Tindle, Mr. Massenburg and Ms. Nikes did not live together at the time, were not financially interdependent, and did not "qualify for a domestic partnership in the state of Virginia."

59.     In fact, Mr. Massenburg and Ms. Nikes were living together at the time and their relationship did qualify as a domestic partnership under applicable law and the NBA Players' Retiree Medical Plan because they had lived together for at least six months and Ms. Nikes was not the domestic partner of anyone else at the time.

60.     Ms. Tindle also stated in her email that this was "not the first time" that Mr. Massenburg and Ms. Nikes had "lied on an affidavit" and "falsified documents."

61.     Those statements were completely false and defamatory as well.

62.     Mr. Massenburg and Ms. Nikes were unaware of Ms. Tindle's false and defamatory statements at the time, and learned of them only later.

63.     Mr. Massenburg and Ms. Nikes learned of the details of Ms. Tindle's report to UnitedHealthcare when they received a copy of the report on May 26, 2023.

64.     Ms. Tindle's false and defamatory accusations of insurance fraud and lying on an affidavit against Ms. Nikes, were particularly damaging for her as a financial professional and insurance agent.

65.     Ms. Tindle also falsely reported that "[Mr. Massenburg] told her that he added [Ms. Nikes] to the policy because she exchanged favors with him to be on the policy."

66.     This too was completely false and highly defamatory.

67.     Finally, Ms. Tindle falsely accused Mr. Massenburg and Ms. Nikes of "fraud." She falsely stated that they had "lied on an affidavit associated with his MBA [sic] insurance about his domestic partnership."

68.     She asked UnitedHealthcare and the NBA Health and Welfare Plan to investigate her allegations, which also led to the NBA's learning of and investigating her false allegations. This was particularly damaging to Mr. Massenburg, as a retired NBA professional basketball player and a television broadcaster for the Washington Wizards NBA basketball team.

69.     In fact, Ms. Tindle made these false and defamatory statements to UnitedHealthcare because *she* wanted to be included as a domestic partner under Mr. Massenburg's health insurance even though she was not qualified for coverage since she was not engaged in a domestic partnership with him at the time. In fact, Mr. Massenburg had not lived with Ms. Tindle since October 2018, after which Mr. Massenburg and Ms. Nikes signed a residential lease to live together.

70.     Thus, Ms. Tindle falsely accused Mr. Massenburg of lying because he was unwilling to lie for her so that she could be fraudulently covered under his health insurance.

71.     Ms. Tindle wanted Mr. Massenburg to improperly add her to his insurance as a domestic partner even though she did not qualify as one, in part because she had recently quit her job and wrongly expected that she could receive health insurance coverage on Mr. Massenburg's plan.

72.     Ms. Tindle made similar false and defamatory statements about Mr. Massenburg and Ms. Nikes to Alight, the NBA Health Plan administrator, in emails on August 15, 2022.

73.     Ms. Tindle made similar false and defamatory statements about Mr. Massenburg to the NBA.

74.     As part of her defamatory and fraudulent conduct, Ms. Tindle also filed a false report of insurance fraud against Mr. Massenburg with the FBI.

75.     Ms. Tindle made this false report to the FBI knowing that it was false at the time

she made it.

76.     Ms. Tindle's false and defamatory statements to UnitedHealthcare and the FBI about Mr. Massenburg and Ms. Nikes damaged their reputation, interfered with their healthcare benefits, and caused them emotional distress.

Defamatory Post on Wikipedia

77.     On or about September 4, 2022, Ms. Tindle posted a false and defamatory statement on Mr. Massenburg's Wikipedia page.

78.     Ms. Tindle's post read, "In August 2022, Tony Massenburg was charged with domestic assault and consented to a protective order in a domestic abuse case."

79.     Ms. Tindle's post falsely implied that, by consenting to a protective order in a domestic abuse case, Mr. Massenburg had acknowledged that he had engaged in domestic abuse.

80.     In fact, Mr. Massenburg strongly denies that he engaged in domestic abuse toward Ms. Tindle.

81.     In the hearing on the matter, which took place on September 1, 2022 (not August), Mr. Massenburg, on advice of counsel, voluntarily entered into the protective order for expediency purposes, with the understanding that there was no admission of guilt as to Ms. Tindle's allegations, which Mr. Massenburg vehemently denies.

82.     In fact, at a subsequent trial on Ms. Tindle's allegations, a jury found in favor of Mr. Massenburg.

83.     Ms. Tindle's Wikipedia post knowingly created a false impression and placed Mr. Massenburg in a false light out of a desire by Ms. Tindle to damage his reputation and cause him emotional distress and other injury.

<u>Defamatory Twitter Post—"Deadbeat Dad"</u>

84.     On or about August 4, 2023, Ms. Tindle posted on Twitter about Mr. Massenburg: "He's a deadbeat dad, he doesn't pay child support but claims [his Son] on taxes."

85.     Ms. Tindle's post came several days after a domestic court hearing at which Ms. Tindle's attorneys argued that neither Mr. Massenburg nor Ms. Tindle should pay child support at that time in light of Mr. Massenburg's loss of income at the time due to a work suspension resulting from Ms. Tindle's tortious conduct.

86.     Otherwise, a likely outcome at that time might have been that Ms. Tindle would have had to pay Mr. Massenburg child support until Mr. Massenburg was able to resume his employment.

87.     Prior to her attorneys' proposal, Mr. Massenburg had never missed a child support payment for their Son.

88.     In fact, Mr. Massenburg had paid *more* than he was required to pay in child support on most occasions and began making child support payments even before the parties' child support agreement had been put in place.

89.     Ms. Tindle's Twitter post calling Mr. Massenburg a "deadbeat dad" falsely implied that Mr. Massenburg had missed child support payments when Ms. Tindle knew that was not the case.

90.     Ms. Tindle's calling Mr. Massenburg a "deadbeat dad" also falsely implied that he neglects his responsibilities for his Son and does nothing for his Son, which is even more hurtful than the financial aspect.

91.     In fact, Mr. Massenburg is a very loving, giving father to his Son, with a strong relationship, as Ms. Tindle has acknowledged and knew at the time of her defamatory post.

92.     Contrary to her defamatory post, Ms. Tindle admitted to a friend that Mr. Massenburg had a really tight bond with their Son.

93.     Mr. Massenburg and Ms. Tindle have joint custody and a joint time-sharing arrangement for their Son. Mr. Massenburg takes care of his Son, who spends almost 40% of his time, including overnights, with Mr. Massenburg. Mr. Massenburg takes his Son on vacations, which is something Ms. Tindle does not do. Mr. Massenburg takes his Son to many of his activities, pays for his summer camp, meets with his teachers, takes him to occupational therapy sessions, and pays for his health and dental insurance expenses. He also taught his Son how to ride a bike and play catch. He has not missed one day of his custodian obligation to his Son.

94.     Ms. Tindle's false and defamatory Twitter post injured Mr. Massenburg's reputation, caused him deep emotional distress, and cast him in a false light.

<u>Defamatory Twitter Post—Stalking</u>

95.     On August 12, 2023, a Twitter post titled "Former NBA Player Tony Massenburg on SXM MDSR's Sport Saturday w/…" appeared, referencing an interview with Mr. Massenburg on a Sirius XM program.

96.     Shortly thereafter, Ms. Tindle replied to the post with the following tweet about Mr. Massenburg: "I wish that he could fill up more of his time working and less of his time stalking me in public places."

97.     Ms. Tindle's tweet falsely implied that Mr. Massenburg had been stalking her, which was not the case.

98.     Ms. Tindle's tweet, which was seen by at least 36 people, also cast Mr. Massenburg in a false light, as a stalker.

99.     In fact, Mr. Massenburg had simply attended a public criminal hearing involving

Ms. Tindle so that he could be aware of the outcome and the impact on their Son.

100.    Ms. Tindle had been arrested for driving without a license, a crime that carries a penalty of up to one year in prison and a $500 fine for a repeat offense.

101.    On information and belief, Ms. Tindle had been driving for over 12 years without a license in Maryland, and, in some cases, with their minor Son as a passenger.

102.    Prior to her most recent arrest, Ms. Tindle had twice pled guilty to driving on a suspended or revoked license, on December 3, 2010, and July 25, 2014.

103.    To make matters worse, at the time of Ms. Tindle's arrest, she provided the Maryland state trooper who pulled her over with a fake identity—a misdemeanor subject to imprisonment for up to a year under Maryland Code, Crim. Law § 8-301(c).

104.    Although Ms. Tindle twice tried to have Mr. Massenburg removed from the courtroom, her request was rejected and she was told that the courtroom was a public place.

105.    Ms. Tindle's tweet also falsely implied that Mr. Massenburg could not get or hold down a job.

106.    What Ms. Tindle neglected to mention, however, is that by making false allegations about Mr. Massenburg to his employer, Ms. Tindle got him temporarily suspended from his employment.

107.    As a result, Ms. Tindle's false and defamatory tweet caused damage to Mr. Massenburg's reputation and overall well-being.

<u>Tindle's Other Bad Acts</u>

108.    In addition to the outrageous conduct described above, Ms. Tindle has made numerous other false, defamatory, and malicious statements about Mr. Massenburg and Ms. Nikes designed to injure their reputations, embarrass them, hurt them, and interfere with their

relationships.

109.    For example, Ms. Tindle falsely accused Mr. Massenburg of squeezing their Son until he collapsed—an outrageous allegation that she told her attorneys and then repeated in court.

110.    Ms. Tindle falsely accused Ms. Nikes of mistreating Mr. Massenburg's and Ms. Tindle's Son when no such mistreatment ever occurred. She made these statements to Mr. Massenburg's attorneys, creating embarrassment for Ms. Nikes when she had to debunk these false accusations.

<u>Demand for Retraction</u>

111.    On November 1, 2023, undersigned counsel for Mr. Massenburg and Ms. Nikes sent a cease-and-desist letter to Ms. Tindle relating to her tortious activity, including that described above, as well as threatened tortious activities by her.

112.    Ms. Tindle had threatened to spread lies about Mr. Massenburg to elected officials, influential people in the community, and Mr. Massenburg's employer.

113.    Among other things, the cease-and-desist letter sought written retractions of Ms. Tindle's false and defamatory statements about Mr. Massenburg and Ms. Nikes.

114.    Ms. Tindle never responded to the letter, leaving Mr. Massenburg and Ms. Nikes with no choice but to pursue this action to obtain the necessary relief and clear their names with respect to Ms. Tindle numerous false and defamatory statements about them.

## **COUNT I**

### **Defamation**

#### *As to Plaintiffs Massenburg and Nikes*

115.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 114 as if set forth in this Count.

116.    Ms. Tindle published numerous false and defamatory statements to third parties

about Mr. Massenburg and Ms. Nikes that caused injury to their reputations and other interests.

117.    As described above, Ms. Tindle made the following false and defamatory statements about Mr. Massenburg and/or Ms. Nikes:

        a.    Falsely accusing Mr. Massenburg and Ms. Nikes of healthcare fraud;

        b.    Falsely accusing Mr. Massenburg and Ms. Nikes of lying on an affidavit about having a domestic partnership so that they could obtain insurance coverage for Ms. Nikes for which she wasn't eligible;

        c.    Falsely accusing Mr. Massenburg and Ms. Nikes of previously falsifying documents and lying on an affidavit;

        d.    Falsely reporting that Mr. Massenburg had told Ms. Tindle that she had added Ms. Nikes to his insurance policy in exchange for "favors";

        e.    Falsely reporting Mr. Massenburg and Ms. Nikes to the FBI for alleged healthcare fraud;

        f.    Falsely implying on Wikipedia that Mr. Massenburg had acknowledged that he had engaged in domestic abuse;

        g.    Falsely labeling Mr. Massenburg a "deadbeat dad" by falsely claiming that Mr. Massenburg didn't pay required child support payments and neglected his Son; and

        h.    Falsely accusing Mr. Massenburg of stalking Ms. Tindle.

118.    Ms. Tindle's false statements about Mr. Massenburg and Ms. Nikes were defamatory *per se* because they falsely accused Mr. Massenburg and Ms. Nikes of criminal, fraudulent, and otherwise wrongful activity. In addition, the words that Ms. Tindle used imputed the defamatory character of what she was saying.

119.    Ms. Tindle's false statements about Mr. Massenburg and Ms. Nikes caused their

standing in the community to suffer and their reputations to be harmed.

120.     Ms. Tindle's false statements were of and concerning Mr. Massenburg and Ms. Nikes because the false statements either identified Mr. Massenburg and Ms. Nikes by name or because Mr. Massenburg and Ms. Nikes were readily identifiable as the subjects by the recipients of the false statements.

121.     Ms. Tindle's false statements implied the existence of undisclosed defamatory facts, making them defamatory for this reason as well.

122.     As described above, Ms. Tindle published these statements about Mr. Massenburg and Ms. Nikes with knowledge that they were false or with reckless disregard as to whether they were true or false, and in bad faith.

123.     In the alternative, Ms. Tindle published these false and defamatory statements about Mr. Massenburg and Ms. Nikes negligently and failed to exercise the requisite standard of care to determine their truth before publishing them.

124.     Ms. Tindle's false and defamatory statements about Mr. Massenburg and Ms. Nikes have caused them damage, including injury to their reputations, financial interests, mental and emotional state, and overall well-being.

125.     Ms. Tindle published these false and defamatory statements with actual and common-law malice because she does not like Mr. Massenburg and Ms. Nikes, was jealous of their success, relationship, popularity, and circumstances, and wanted to harm them in any way that she could.

126.     Ms. Tindle refused Mr. Massenburg and Ms. Nikes's demand for a retraction because, on information and belief, she sought to harm them or was recklessly indifferent to the harm caused to them by her actions.

## COUNT II

### False Light Invasion of Privacy

### *As to Plaintiffs Massenburg and Nikes*

127.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 126 as if set forth in this Count.

128.    By publishing false and defamatory statements about Mr. Massenburg and Ms. Nikes, Ms. Tindle gave publicity to matters concerning Mr. Massenburg and Ms. Nikes that placed them in a false light before a large number of recipients.

129.    As described above, Ms. Tindle placed Mr. Massenburg and Ms. Nikes in a false light when she:

> a.      Falsely accused Mr. Massenburg and Ms. Nikes of healthcare fraud;

> b.      Falsely accused Mr. Massenburg and Ms. Nikes of lying on an affidavit about having a domestic partnership so that they could obtain insurance coverage for Ms. Nikes for which she wasn't eligible;

> c.      Falsely accused Mr. Massenburg and Ms. Nikes of previously falsifying documents and lying on an affidavit;

> d.      Falsely reported that Mr. Massenburg had told Ms. Tindle that she had added Ms. Nikes to his insurance policy in exchange for "favors";

> e.      Falsely reported Mr. Massenburg and Ms. Nikes to the FBI for alleged healthcare fraud;

> f.      Falsely implied on Wikipedia that Mr. Massenburg had acknowledged that he had engaged in domestic abuse;

> g.      Falsely labeled Mr. Massenburg a "deadbeat dad" by falsely claiming that Mr. Massenburg didn't pay required child support payments and neglected his Son; and

      h.      Falsely accused Mr. Massenburg of stalking Ms. Tindle.

130.    Ms. Tindle's actions in placing Mr. Massenburg and Ms. Nikes in a false light would be highly offensive to a reasonable person.

131.    Ms. Tindle knew that the statements about Mr. Massenburg and Ms. Nikes were false or acted with reckless disregard as to the statements' truth or falsity and the false light in which Mr. Massenburg and Ms. Nikes were placed.

132.    As a result of Ms. Tindle's actions, Mr. Massenburg and Ms. Nikes have suffered damages, including injury to their professional and personal reputation, emotional distress, mental anguish, financial loss, and harm to their overall well-being.

## COUNT III

### Fraud

#### *As to Plaintiff Massenburg*

133.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 132 as if set forth in this Count.

134.    Ms. Tindle obligated Mr. Massenburg for the tuition and related expenses for their Son at the School without Mr. Massenburg's knowledge and consent.

135.    Ms. Tindle did this by creating a fake email address containing Mr. Massenburg's name, without his knowledge and consent, and then falsely representing to the School that Mr. Massenburg was agreeing to be financially responsible for their Son's tuition and expenses, without Mr. Massenburg's knowledge and consent and even though Ms. Tindle had agreed with Mr. Massenburg that she would be solely responsible for the costs of private school.

136.    As part of her subterfuge, Ms. Tindle provided false contact information for Mr. Massenburg to the School so that the School would not contact Mr. Massenburg directly about the obligation of which he knew nothing about.

137.    Ms. Tindle had no right to obligate Mr. Massenburg to the School without his knowledge and consent.

138.    Ms. Tindle also had a duty to disclose to Mr. Massenburg the obligation to the School and obtain his knowledge and consent before obligating him.

139.    Ms. Tindle failed to disclose any of this to Massenburg as part of her scheme to defraud the School and Mr. Massenburg.

140.    Ms. Tindle did this to deceive both the School and Mr. Massenburg because she knew that if Mr. Massenburg knew that she was obligating him to the School in this manner, he would have taken action to prevent it.

141.    Because Mr. Massenburg did not know anything about Ms. Tindle's fraudulent scheme, he could not take any action to prevent it.

142.    As a result of Ms. Tindle's fraudulent scheme, Mr. Massenburg suffered damages in the form of costs and attorney fees in attempting to extricate himself from the situation, as well as damage to his credit history as a result of Ms. Tindle's causing it to appear that Mr. Massenburg was not honoring his obligation to the School when in fact Mr. Massenburg had never agreed to be obligated and knew nothing of the obligation until after the fact when Ms. Tindle's fraudulent scheme became known to him.

143.    Mr. Massenburg also suffered emotional distress and mental anguish upon learning of Ms. Tindle's elaborate fraud and having to find a way to extricate himself from it.

144.    Moreover, because Ms. Tindle acted knowingly and maliciously in defrauding both the School and Mr. Massenburg, she should be subject to punitive damages for her fraudulent conduct.

## COUNT IV

### Tortious Interference with Contractual Relations

#### *As to Plaintiffs Massenburg and Nikes*

145.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 as if set forth in this Count.

146.    Ms. Tindle falsely accused Mr. Massenburg of healthcare fraud to the NBA Players' Health and Welfare Benefits Plan Service Center and UnitedHealthcare.

147.    Ms. Tindle falsely accused Mr. Massenburg and Ms. Nikes of lying on an affidavit about having a domestic partnership to obtain insurance coverage for Ms. Nikes for which she was not otherwise entitled.

148.    Ms. Tindle made these false accusations with knowledge that they were false or with reckless disregard for whether these statements were true or false.

149.    Ms. Tindle made these false accusations for the purpose of interfering with Mr. Massenburg's and Ms. Nikes's health insurance and potentially depriving them of coverage entirely.

150.    Ms. Tindle had no justifiable cause or right to make these false accusations against Mr. Massenburg and Ms. Nikes and made these false accusations with malice.

151.    In fact, the reason Ms. Tindle engaged in this improper action was because Mr. Massenburg was unwilling to make fraudulent representations about a domestic partnership between Mr. Massenburg and Ms. Tindle, as Ms. Tindle had demanded so that she could obtain insurance coverage to which she was not otherwise entitled.

152.    Ms. Tindle's actions caused injury to Mr. Massenburg and Ms. Nikes, including emotional distress and mental anguish and out-of-pocket expenses in dealing with and correcting these false allegations, as well as injury to their reputations and other interests.

153.     Moreover, because Ms. Tindle acted knowingly and maliciously in making these false allegations against Mr. Massenburg and Ms. Nikes, she should be subject to punitive damages for her actions.

## COUNT V

### Malicious Prosecution

### *As to Plaintiff Massenburg*

154.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 153 as if set forth in this Count.

155.     Ms. Tindle filed a false report of insurance fraud against Mr. Massenburg with the FBI and possibly against Ms. Nikes as well.

156.     Ms. Tindle did this when she knew at the time that Mr. Massenburg had not engaged in any type of insurance fraud or acted with reckless disregard for the truth as to whether Mr. Massenburg had engaged in any type of insurance fraud.

157.     Ms. Tindle filed this false report with the FBI despite lacking probable cause that Mr. Massenburg had engaged in insurance fraud.

158.     Ms. Tindle filed this false report with the FBI in retaliation for Mr. Massenburg's unwillingness to engage in insurance fraud to benefit Ms. Tindle.

159.     Thus, Ms. Tindle filed this false report with the FBI against Mr. Massenburg with actual and common-law malice.

160.     On information and belief, the FBI has decided not to take any further action against Mr. Massenburg on Ms. Tindle's false police report.

161.     However, Mr. Massenburg sustained damages in the form of out-of-pocket expenses, emotional distress, and mental anguish as a result of Ms. Tindle's improper action.

162.     Because Ms. Tindle acted knowingly and maliciously in making these false

allegations against Mr. Massenburg to the FBI, she should be subject to punitive damages for her actions.

For these reasons, Mr. Massenburg and Ms. Nikes demand judgment against Ms. Tindle in an amount to be determined at trial as follows:

1.      compensatory damages in excess of $500,000;

2.      punitive damages in excess of $500,000;

3.      together with interest, costs, and other expenses, and such other relief as may be appropriate under the circumstances.

Dated:  May 24, 2024

Respectfully submitted,

*/s/David S. Wachen*
David S. Wachen (Bar No. 12790)
WACHEN LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121
Fax (301) 259-3846
david@wachenlaw.com

*Counsel for Plaintiffs Tony Massenburg and Lanie Nikes*

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

*/s/David S. Wachen*
David S. Wachen